**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 22 2003**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

No. 02-5149

WILLIE EARL FLOWERS,

    Defendant - Appellant.

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D.C. No. 02-CR-22-EA)**

Lucy O. Roberts, Assistant United States Attorney (David E. O'Meilia, United States Attorney, with her on the brief), Northern District of Oklahoma, Tulsa, Oklahoma, for Plaintiff - Appellee.

Paul D. Brunton, Federal Public Defender (Barry L. Derryberry, Office of Federal Public Defender, with him on the brief), Northern and Eastern Districts of Oklahoma, Tulsa, Oklahoma, for Defendant - Appellant.

Before **O'BRIEN** and **HOLLOWAY**, Circuit Judges, and **LUNGSTRUM,** District Judge.[*]

**HOLLOWAY**, Circuit Judge.

---

    [*]The Honorable John W. Lungstrum, Chief Judge, United States District Court, District of Kansas, sitting by designation.

This is an appeal involving the denial of a suppression motion. After defendant/appellant Willie Earl Flowers' suppression motion was denied, Flowers entered a conditional plea of guilty to a charge of possession of a firearm after a former felony conviction. A sentencing issue is raised as to whether the district court correctly concluded that he was in the category of armed career criminals, subject to a mandatory minimum sentence of fifteen years.

I

**BACKGROUND**

The information that led to Flowers' arrest came from a person questioned by Officers White and Bella of the Tulsa Police Department following a traffic stop on November 4, 2001, at approximately 1:55 a.m. I App. (Doc. 11: Order denying motion to suppress at 1). The driver told the officer that liquor was being sold illegally at a north side Tulsa residence. The driver further said that almost anything, including drugs, cigarettes, and prostitutes, could be bought at the house, and that the person selling liquor had a pistol. The driver said that this "juice joint" was then open for business. III App. 22-23 (04/10/02 hearing transcript). The police were aware that the location had been a juice joint two years before when a homicide occurred there. III App. 18-19, 22 (04/10/02 hearing transcript). The government made no allegation that the defendant had any connection with that homicide whatsoever. III App. 19.

Officers White and Bella approached the house and knocked on the door after two other officers they had called in as back up had positioned themselves at the back of the house. I App (Doc 11: Order denying motion to suppress at 2), III App. 42 (04/10/02 hearing transcript). Flowers responded to the knock by asking, from behind the closed door, "what do you want?" I App (Doc 11 at 2). One of the officers answered "T Bird," a slang term for Thunderbird, a brand of cheap wine. *Id.* After Flowers indicated that he didn't have any of that, or of the second wine requested, the officer asked what he did have. *Id.* Flowers replied, "I got some Rose," which was understood to refer to Wild Irish Rose, another brand of cheap wine. Officer White said, "That'll work." *Id.*

At this point, a panel adjacent to the front door opened, and defendant's hand emerged from a hole in the wall, with a bottle of Wild Irish Rose wine. I App (Doc 11 at 2). Flowers said that it would cost three dollars. An officer then said, in a firm tone of voice, "Tulsa Police Department, open the door." Flowers said, "Hold on a minute." The officers then heard a loud "thud" from right behind the door. It sounded like a hard object, which they believe could have been a gun, falling to the floor. *Id.*

Flowers opened the door after approximately 15 to 25 seconds. I App. (Doc 11 at 2). The officers identified themselves and went inside to take defendant into custody. III App. 30, 32. One of the officers asked Flowers if he had any weapons and Flowers said there was a shotgun behind the bedroom door. Officer Bella saw a .25 caliber semi-automatic pistol in plain view near the front door and found sixty-seven bottles of various types of liquor.

Flowers denied ownership of the pistol. He also admitted to the officers that he had formerly been convicted of a felony. I App. (Doc 11 at 2). The officers arrested defendant for the illegal sale of alcohol between the hours of 2:00 a.m. and 7:00 a.m., a misdemeanor under Oklahoma law. I App (Doc. 11 at 3 (citing Okla. Stat. tit. 37, § 213 (2000)).

Flowers was charged on February 8, 2002, in a one-count federal indictment with possession of firearms and ammunition, which possession was in and affecting interstate commerce, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). I App. (Doc 1: Indictment at 2). After his initial appearance, Flowers filed a motion to suppress evidence from the seizure, arrest, and entry of Flowers' home. I App. (Doc 8: Defendant's Motion to Suppress at 1). The district judge denied the motion to suppress. I App. (Doc. 11: Order). Flowers entered a conditional plea of guilty on June 12, 2002, reserving the right to appeal the district court's ruling overruling his motion to suppress evidence. I App. (Doc. 27: Petition to enter plea of guilty and order entering plea at 2, 3).

II

**THE DISTRICT COURT'S RULINGS ON THE SUPPRESSION MOTION**

A. The order denying Flowers' motion to suppress

The district judge issued two orders on the suppression motion – an initial order denying the motion to suppress and an order denying a motion to reconsider the initial order. In the first order, the district judge concluded that defendant did not have an expectation of privacy in his home that society would recognize as reasonable because of his use of the

-4-

home for business purposes and because he extended his hand and a portion of his arm and projected his voice outside the walls. I App. (Doc. 11 at 5-6). He "knowingly exposed too much of himself to the public" to claim a violation of the Fourth Amendment, she concluded. *Id*. at 6.

The judge distinguished *Payton v. New York*, 445 U.S. 573 (1980), relied on by defendant/appellant, on the basis that the instant case did not involve a "routine" felony arrest like that discussed in *Payton*. Instead, she reasoned, this is a case in which the arrest was made "in immediate response to the commission of a crime." I App. (Doc. 11 at 7). She cited *McKinnon v. Carr*, 103 F.3d 934, 936 (10th Cir. 1996), in which the Tenth Circuit held that *Payton* did not apply to an arrest where the defendant opened the door in response to the officers' knock. I App. (Doc. 11 at 5). She also cited *United States v. Santana*, 427 U.S. 38 (1976), where the Court held that a person standing at his threshold is in a public place. I App. (Doc. 11 at 5). And, she said that "when 'the home is converted into a commercial center to which outsiders are invited for purposes of transacting unlawful business, that business is entitled to no greater sanctity than if it were carried on . . . on the street.'" I App. (Doc. 11 at 5-6 (quoting from *Lewis v. United States*, 385 U.S. 206, 211 (1967)).

B. Order denying Flowers' motion for reconsideration of the motion to suppress

The district judge modified her views in the second order. She discussed probable cause at some length and analyzed the statutes potentially violated by defendant's attempted sale. I App. (Doc. 22 at 2-5). She said that *Lewis* was not applicable to this fact pattern. *Id.*

at 5-6. Turning to defendant's argument based on *Payton*, she said that even though the language there *seemed* to create a bright line rule regarding entry of the home, the Tenth Circuit's opinion in *McKinnon* showed that this court "has not construed *Payton* as standing for this 'bright-line rule.'" I App. (Doc. 22 at 7). She said that, like the defendant in *McKinnon*, Flowers was in a place "sufficiently public" that he had no legitimate expectation of privacy. I App. (Doc. 22 at 7 n.2).

Significantly, neither the original order denying suppression nor the order denying reconsideration made findings on whether exigent circumstances existed to support the officers' conduct or addressed specifically the question of exigent circumstances.

III

**DISCUSSION**

A. Flowers' Warrantless Arrest

The ultimate determination of the reasonableness of a warrantless search or seizure under the Fourth Amendment is a determination of law reviewed *de novo*. *United States v. Gutierrez-Hermosillo*, 142 F.3d 1225, 1229 (10th Cir.), *cert. denied*, 525 U.S. 900 (1998). The district court's findings of fact are reviewed for clear error. *Id.*

As we explain below, we agree with Flowers' assertion that his arrest within his home was a violation of his Fourth Amendment rights. The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but

-6-

upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." We are not persuaded by the government's arguments attempting to avoid the clear language of the amendment and the protection it plainly affords.

1. The Application of *Payton* and *Kirk*

In *Payton,* 445 U.S. at 590, the Supreme Court held, in terms that apply "equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. *Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."* (emphasis added). The Court noted that the "'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Id.* at 585 (quoting *United States v. United States District Court*, 407 U.S. 297, 313 (1972)); *see also United States v Maez,* 872 F.2d 1444, 1450-51 (10th Cir. 1989). The Amendment "protects the individual's privacy in a variety of settings." *Payton*, 445 U.S. at 589. In none is "the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home – a zone that finds its roots in clear and specific constitutional terms: 'The right of the people to be secure in their . . . houses . . . shall not be violated.'" *Payton*, 445 U.S. at 589 (quoting U.S. Const. amend. IV). That language, the Court explains, "unequivocally establishes the proposition that '[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Payton*, 445 U.S. at 589-90

(quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)).

The Supreme Court recently reiterated the teachings of *Payton* in *Kirk v. Louisiana*, 536 U.S. 635 (2002). There the Court held that as "Payton makes plain*, police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home.*" 536 U.S. at 638 (emphasis added). We note that *Kirk* was decided some two weeks *after* Judge Eagan's final order on suppression; thus she did not have the benefit of *Kirk* when she made her rulings.

In considering the significance of *Payton* and *Kirk,* it should be noted that the instant case differs from the consolidated cases decided in *Payton* in that in both of those cases the Court was dealing with entries into homes made without the consent of any occupant. In the instant case it is true that after the initial colloquy about the purchase of wine, an officer said: "Tulsa Police Department, open the door." Flowers then opened the door to his abode.[1] However, this difference is not dispositive because the facts of the present case are similar to the situation in *Kirk* where the officers knocked on an apartment door and then arrested the defendant. 536 U.S. at 636.[2]

---

[1] In the case of *Payton*, the officers used crowbars to break open the door and enter the apartment. *Payton*, 445 U.S. at 576-77. In the case of *Riddick*, which was decided with *Payton*, the officers knocked on the door of the house where Riddick lived, and when his three year-old son opened the door, they entered and arrested Riddick. *Id.* at 578, 583.

[2] An arrest or seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen. . . ." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). *See also Dunaway v. New York*, 442 U.S. 200, 207 n.6 (1979). A show "of official authority such that 'a reasonable person would have believed he was not free to leave'" indicates

(continued...)

Applying *Payton* and *Kirk* to the facts of the instant case, we hold that unless there were exigent circumstances, the Tulsa Police Department's arrest of Flowers and the subsequent search of Flowers' home violated the Fourth Amendment. The record shows that at the time of Flowers' arrest, and from the time that night at which the police officers first came to Flowers, Flowers was inside his home. Although Flowers put his arm and hand outside his house by extending them through the panel opening, the rest of his body did not cross his threshold.[3] We believe that Flowers did not lose "the constitutional protection afforded to the individual's interest in the privacy of his own home," *Payton*, 445 U.S. at 588, by this limited exposure. Rather, Flowers showed a conscious intention to protect the privacy of his home by utilizing only the small hole in the wall.[4]

---

[2](...continued)
that a seizure has occurred. *Florida v. Royster*, 460 U.S. 491, 502 (1983) (plurality opinion) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (opinion of Justice Stewart joined by Justice Rehnquist)). "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer . . . or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554.

Turning to the present case, a reasonable person confronted by police officers outside his door at night and a command by one of the officers to allow them to enter, would have believed that he had to open the door of his home and submit to the show of authority. Accordingly, we hold that Flowers' decision to open his door was not voluntary and he was arrested while in his home.

[3] It should also be noted that White stated that when Flowers opened the door he "was *standing in the living room area*, which (sic) that's what the door opens into," and soon after this Flowers was arrested. III App. 32, 34 (04/10/02 hearing transcript) (emphasis added). Thus, Flowers was clearly inside his home when he was arrested.

[4] The district court made an important finding of fact in Flower's case: "While standing *inside his house with the front door closed*, Flowers opened an exterior panel adjacent to the door

(continued...)

-9-

Although the district judge ruled that the police officers had probable cause to arrest Flowers, she did not make subsidiary findings as to whether exigent circumstances were present, nor an ultimate finding in terms of exigent circumstances. Because the district judge did not make a determination on this issue, we do not decide that critical question. As *Payton* and *Kirk* make plain, "police officers need either a warrant or probable cause *plus exigent circumstances* in order to make a lawful entry into a home." *Kirk,* 536 U.S. at 638 (emphasis added); *see also Payton,* 445 U.S. at 590. Thus, under *Payton* and *Kirk*, unless exigent circumstances existed, the police violated Flowers' Fourth Amendment rights.

The district judge held, agreeing with the government, that the police officers' arrest of Flowers and search of his home did not violate Flowers' Fourth Amendment rights under the Supreme Court's opinion in *United States v. Santana*, 427 U.S. 38 (1976) and this court's opinion in *McKinnon v. Carr,* 103 F.3d 934 (10th Cir. 1996). We cannot agree because the instant case is materially different than *Santana* and *McKinnon*.

In *Santana*, police officers arrested a woman inside her home after setting the arrest in motion at the threshold of her home. 427 U.S. at 40-41. The Supreme Court ruled that while standing in the doorway to her house, the defendant was in a "public" place for purposes of the Fourth Amendment. *Id.* at 42. The Court stated that Santana was "not in an area where she had any expectation of privacy." *Id.* What a person knowingly exposes to

---

[4](...continued)
and attempted to illegally sell alcohol to an officer by reaching outside through an opening in the wall." Order at 6 (emphasis added).

the public, "'even in his own house or office, is not a subject of Fourth Amendment protection.'" *Id.* (quoting *Katz v. United States*, 389 U.S. 347, 351 (1967)).  Santana was "not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house." *Santana*, 427 U.S. at 42 (citing *Hester v. United States*, 265 U.S. 57, 59 (1924)).  It should be noted that unlike the present case, the police entered Santana's house in hot pursuit after initiating the arrest in a public place.  *Santana*, 427 U.S. at 42-43.

In *McKinnon*, this court held that the warrantless arrest of McKinnon as he stood in the threshold of the doorway to his residence was valid and the police could thereafter lawfully accompany defendant into his residence while he dressed.  This court held that "the district court did not err in holding that the arrest at the doorway was not invalid." *McKinnon*, 103 F.3d at 935.  As in *Santana*, the suspect was "visible, standing in the threshold of his doorway, open to public view." *McKinnon*, 103 F.3d at 935.  This court reasoned that McKinnon was "in a place *sufficiently public* that he had *no legitimate expectation of privacy*." *Id.* (emphasis added).  In addition, this court differentiated *McKinnon* from *Payton* because *"Payton* contains language that describes the Fourth Amendment as drawing a firm line at the entrance to one's house, but, on its facts, it has no application to a doorway arrest made in the circumstances of the present case." *McKinnon*, 103 F.3d at 936.

In contrast, here the suspect was not visible to the public and his doorway was not

open to public view. Rather only Flowers' hand and arm were visible and he used a hole in the wall so that he would not have to open his door and neither he nor the interior of his house would be open to public view. Unlike the situations in *Santana* and *McKinnon*, Flowers was not as exposed to public view, speech, hearing, and touch as if he had been standing completely outside his house. *Santana*, 427 U.S. at 42; *McKinnon*, 103 F.3d at 935-36. Thus, we feel that Flowers was not in a place sufficiently public that he had no legitimate expectation of privacy. Instead, he was within the privacy of his home, the walls of which cannot be breached without an arrest or search warrant or probable cause, combined with exigent circumstances, without violating the Fourth Amendment. Absent exigent circumstances, the police's arrest of Flowers and subsequent search of his home violated the Fourth Amendment.

This court's opinion in *United States v. Davis*, 290 F.3d 1239 (10th Cir. 2002), gives us important guidance. In Davis, we held that the "'existence of exigent circumstances is a mixed question of law and fact.'" 290 F.3d at 1241 (quoting *United States v. Anderson*, 154 F.3d 1225, 1233 (10th Cir. 1998) (quoting *United States v. Anderson*, 981 F.2d 1560, 1567 (10th Cir. 1992)). Although we accept underlying fact findings unless they are clearly erroneous, the determination whether those facts satisfy the legal test of exigency is subject to *de novo* review. *Davis,* 290 F.3d at 1241 (citations omitted).

In *Davis*, we carefully considered the several contentions of the government. The government argued that there is a general assumption that domestic calls are always

dangerous. We rejected this contention and held that an officer's warrantless entry into a home is not exempt from the requirement of demonstrating exigent circumstances. 290 F.3d at 1244. After review of the government's contentions in *Davis*, we concluded that "the facts do not satisfy the legal test of exigency," and affirmed the grant of the motion to suppress. *Id.*

Here the district judge's reasoning in her initial order was that "Flowers knowingly exposed too much of himself to the public to claim that the officers' warrantless entry for the limited purpose of effectuating his arrest violated the Fourth Amendment." I App. (Doc. 11 at 6). The judge reiterated this reasoning in her second order. I App. (Doc 22 at 7). It was upon this conduct of Flowers, without any discussion of exigent circumstances, that suppression was denied. We cannot agree with the judge's rejection of Fourth Amendment protection on such a basis. The mandate of *Payton* and *Kirk* is too clear: As noted earlier, *Payton* held that "the Fourth Amendment has drawn a firm line at the entrance to the house. *Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."* 445 U.S. at 590 (emphasis added). *See also Kirk v. Louisiana*, 536 U.S. at 638.

2. Exigent Circumstances

i. The exigent circumstances issue as raised below

Both the government and Flowers addressed the issue of exigent circumstances at the suppression hearing and the hearing on the motion to reconsider. The government argued that exigent circumstances existed. During the direct examination of Officer White, one of

the arresting officers, the government asked whether White or his partner had any concerns for their safety when they heard a thud in the seconds between White's command that Flowers open the front door and when Flowers opened the door. III App. at 35. White answered in the affirmative because "we had previous information that there's possibly a gun within the residence. As with any call, we're extremely concerned about our . . . safety." *Id.* White also mentioned that he had been concerned about a homicide that had occurred at the same house two years before. *Id.* Thus, the government suggested by these arguments that exigent circumstances did exist.

On the other hand, Flowers, by his cross-examination of Officer White, developed several arguments that exigent circumstances did not exist. First, Flowers questioned the reliability of the informants who told White about the juice joint. III App. 41. White admitted that he had never met the informants before the night in question. *Id.* at 41-42. Additionally, the driver of the car, who provided the most information, may have been "driving under suspension" and the passenger had "three outstanding city misdemeanor warrants," but White did not arrest either occupant of the car. (White adds that the passenger was eight or nine months pregnant). III App. 47. Second, Flowers established that the police had Flowers' house surrounded, with White and Bella at the front door and two other officers at the rear, when police contact with Flowers began. III App. 42. Third, White conceded that he went to Flowers' house to investigate a violation of the Oklahoma law prohibiting the sale of alcohol between 2 a.m. and 7 a.m, III App. 43, 45, pointing toward a minor offense

and a lack of exigent circumstances. Following the cross-examination of White, Flowers showed that the Oklahoma law carries a $500 fine and up to six months of imprisonment, and thus was not a serious offense. III App. 49. Finally, White admitted that he did not see Flowers with a firearm before he entered Flowers' house. III App. 43. Thus, Flowers made a number of arguments that exigent circumstances did not exist.

ii. Exigent circumstances as addressed on appeal

On appeal, both parties make arguments similar to the ones they offered below. Flowers argues that no exigent circumstances existed to legitimize a warrantless entry into his home. Principal Brief of Defendant-Appellant at 12. Under *Welsh v. Wisconsin,* 466 U.S. 740, 749-50 (1984), the government bears "a heavy burden" when "attempting to demonstrate an urgent need that might justify warrantless searches or arrests."[5] *Welsh* also stated that "[w]hen the government's interest is only to arrest for a minor offense, that presumption of unreasonableness [of a search and seizure] is difficult to rebut, and the government usually should be allowed to make such arrests only with a warrant issued upon probable cause by a neutral and detached magistrate." 466 U.S. at 750. Additionally, the Court stated that application of the exigent circumstances exception "in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor

---

[5] Although Flowers does not mention this point in his brief, it should be noted that the Court pointed out that it has recognized only a few such emergency conditions and has applied only the "hot pursuit" doctrine to arrests in the home. *Welsh,* 466 U.S. at 750 (citing *Santana*, 427 U.S. at 42-43 (hot pursuit of a fleeing felon); *Warden v. Hayden*, 387 U.S. 294, 298-99 (1967) (same); *Schmerber v. California*, 384 U.S. 757, 770-71 (1966) (destruction of evidence); *Michigan v. Tyler*, 436 U.S. 499, 509 (1978) (ongoing fire)).

-15-

offense . . . has been committed." *Id.* at 753.

Flowers points out that the Oklahoma state offense he was arrested for, selling alcoholic beverages without a license, is a minor offense. Principal Brief of Defendant-Appellant at 10-12. The plain language of Okla. Stat. tit. 37, § 538(C) (2002) states that a violation of the Oklahoma Alcoholic Beverage Control Act is a *misdemeanor* which carries a fine of not more than $2,500 and imprisonment for no more than six months (emphasis added). Flowers further states that "the statute identified by the district court which delineates specific criminal acts forbids selling, not attempted selling," Principal Brief of Defendant-Appellant at 10 (citing Okla. Stat. tit. 37, § 505 (1999)), and under Oklahoma law "an attempt to commit a crime punishable by imprisonment and fine is punishable by up to one-half the imprisonment and fine applicable to commission of the offense." Principal Brief of Defendant-Appellant at 10 (citing Okla. Stat. tit. 21, § 42.4 (2001)). Thus, punishment applicable to the offense committed by Flowers, according to Flowers, "was a fine of up to $1,250 and imprisonment for no more than three months." Principal Brief of Defendant-Appellant at 11. Flowers notes that this court in *Howard v. Dickerson*, 34 F.3d 978, 982 (10th Cir. 1994), followed the Supreme Court's *Welsh* decision and found that the offenses of careless driving and leaving the scene of an accident, misdemeanors carrying a penalty of up to $300 fine and/or up to ninety days in jail, were minor offenses which did "not merit the extraordinary recourse of warrantless home arrest."

Finally, Flowers argues in the alternative that if any exigent circumstances existed,

they were attributable to the police officers' own actions and cannot be relied on as establishing exigent circumstances. Principal Brief of Defendant-Appellant at 12. The police are not free to create exigencies to justify warrantless intrusions. *United States v. Morgan*, 743 F.2d 1158, 1163 (6th Cir. 1984).

The government counters that exigent circumstances existed. It admits that under *Welsh* and *Howard,* the fact that a misdemeanor offense is involved has an effect in the determination of exigency and does not dispute that such violations are misdemeanors. Appellee's Brief at 22-25. In Flowers' case the government says there were unique, additional factors establishing exigency. Appellee's Brief at 25. The officers had been told that liquor, cigarettes, and drugs were being sold from Flowers' house and that Flowers possessed a firearm. *Id.* at 26. The information the officers had been told was corroborated, the government asserts, after the officers approached Flowers' house and verified that liquor was being sold illegally. *Id.* Subsequently, the officers had reasonable cause to believe Flowers had a firearm and that he knew police officers have verified the illegal sale of liquor. According to the government, this created a set of exigent circumstances for the safety of the officers and the public as well as the potential for destruction of evidence. *Id. See also Warden v. Hayden*, 387 U.S. 294, 298-99 (1967); *United States v. Smith,* 797 F.2d 836, 840 (10th Cir. 1986); *United States v. Wicks*, 995 F.2d 964, 969 (10th Cir. 1993). Officer White was additionally aware that approximately two years earlier a homicide had occurred in the same place. Appellee's Brief at 26.

Despite the fact that both sides addressed the question of exigent circumstances below, the orders denying suppression and reconsideration of that denial did not make subsidiary findings or an ultimate determination on exigent circumstances. In light of these circumstances, we do not feel we should make an exigent circumstances determination. The findings and conclusion therefrom on that issue should be made first by the district judge after any further proceedings that she feels are desirable on remand.

B. Flowers' Sentencing

Flowers also argues that his prior conviction for escape was not a violent offense for the purposes of the Armed Career Criminal Act as found below. *See* Principal Brief of Defendant-Appellant at 14. However because we are vacating the district court's orders and remanding for further proceedings we feel it is inappropriate to address the issue of Flowers' sentencing status at this time.

## IV

## CONCLUSION

Flowers' arrest and the subsequent search of his home were therefore invalid. We accordingly **VACATE** the judgment of the district court and the orders denying the motion to suppress and the motion to reconsider that order and **REMAND** for further proceedings not inconsistent with this opinion.