*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0874**

State of Minnesota,
Respondent,

vs.

Charles Edward Gorgol,
Appellant.

**Filed July 13, 2015
Affirmed
Smith, Judge
Concurring in part, dissenting in part, Hudson, Judge**

Clay County District Court
File No. 14-CR-13-2876

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Brian J. Melton, Clay County Attorney, Johnathan R. Judd, Assistant County Attorney,
Moorhead, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Bridget Sabo, Assistant Public
Defender, St. Paul, Minnesota; and

W. Anders Folk, Ruth Shnider, Stinson Leonard Street, LLP, Special Assistant Public
Defenders, Minneapolis, Minnesota (for appellant)

        Considered and decided by Hudson, Presiding Judge; Kirk, Judge; and Smith,

Judge.

**UNPUBLISHED OPINION**

**SMITH**, Judge

We affirm the district court's denial of appellant Charles Gorgol's suppression motion because the district court did not clearly err by finding that Gorgol voluntarily opened his door to talk to police. In addition, the district court did not plainly err by admitting the recording of Gorgol's statements to police in violation of *Miranda* when defense counsel failed to object. And Gorgol did not meet his burden on his ineffective-assistance-of-counsel claim because he did not demonstrate that the erroneously admitted statements affected the verdict.

## FACTS

On August 24, 2013, a toll-booth operator reported a possibly impaired driver to Moorhead police. The toll-booth operator stated that the driver almost fell out of his car while attempting to pay the toll, had slurred speech, and nearly hit a portable toilet as he drove away. The toll-booth operator gave a description of the driver and the car to police. Around 11:50 p.m., officers were dispatched to the toll bridge and took a statement from the operator, which included the make and license plate of the driver's car.

The officers proceeded to the address where the car was registered, arriving approximately 10 minutes later, around midnight. The address was an apartment complex, at which the officers found a car matching the description and plate information given by the toll-booth operator. One officer noted that he had been at the apartment complex before on a domestic-dispute call. As the officers approached the apartment

2

complex, they heard a male voice shouting inside the apartment. The man was loudly yelling, "[Y]ou're a stupid bitch," and "things of that nature" at another person inside.

An officer knocked on the door of the apartment. After a woman asked, "Who is it?," the officer responded, "Police Department." When there was no further response, the officer knocked and identified himself again. Then, a male asked, "What do you want?" The officer replied, "Open the door so we can talk with [you]." Following an inaudible reply, the officer repeated himself. Then, a person later identified as Gorgol opened the door.

The officers asked Gorgol if they could come in, if he would step outside the apartment, or if they could talk to other people in the home. Gorgol denied all the officers' requests. The officers immediately noticed indicia of intoxication, including the odor of alcoholic beverage on his breath, bloodshot and watery eyes, slurred speech, and poor balance. Gorgol also admitted that he was intoxicated. In addition, Gorgol matched the description given by the toll-booth operator and was the only male in the apartment. The officers arrested Gorgol on suspicion of driving while impaired.

After transporting Gorgol to the county jail, the arresting officer read him the implied-consent advisory. During the reading of the advisory, Gorgol admitted that he was drunk and that he had talked to the toll-booth operator earlier, but denied that he had been driving when he was drunk. Gorgol eventually agreed to take a breath test, so another officer administered the test. During the test, Gorgol complained that the arresting officer had arrested him when he was not actually driving. The testing officer then asked Gorgol to "tell [him] what happened" because he was the arresting officer's

supervisor. Gorgol stated that he had been drinking at a friend's house with his girlfriend, who owned the car, but that she had driven him home. The breath test measured Gorgol's alcohol concentration at .19.

The state charged Gorgol with two counts of felony driving while impaired (DWI) for operating a motor vehicle while under the influence of alcohol and for having an alcohol concentration of at least .08 within two hours of operating a motor vehicle. At trial, the district court denied Gorgol's motion to suppress evidence resulting from an unreasonable search or seizure because it found, based on a recording of the interaction, that Gorgol voluntarily opened his door to talk to the police. In addition, the district court admitted a recording of Gorgol being read the implied-consent advisory and taking the breath test. Gorgol did not object to the admission of the implied-consent-advisory recording.

A jury found Gorgol guilty on both counts.

## DECISION

### I.

Gorgol first argues that he was seized when he opened the door to his home and that the district court erred by denying his motion to suppress all evidence derived from his seizure. The district court found that Gorgol voluntarily opened his door when he knew the police were outside and wanted to talk to him. Gorgol argues that he was merely acquiescing to a police command.

When reviewing pretrial orders on motions to suppress evidence, we review the district court's factual findings for clear error, *State v. Lemieux*, 726 N.W.2d 783, 787

4

(Minn. 2007), and its decision whether to suppress the evidence as a matter of law, *State v. Harris*, 590 N.W.2d 90, 98 (Minn. 1999).

The United States and Minnesota Constitutions prohibit unreasonable searches and seizures. U.S. Const. amend IV; Minn. Const. art. I, § 10. A warrantless seizure in a home is per se unreasonable absent an exception to the warrant requirement. *Payton v. New York*, 445 U.S. 573, 586, 589-90, 100 S. Ct. 1371, 1380, 1381-82 (1980). Any evidence acquired as a result of an unconstitutional seizure must be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 484, 83 S. Ct. 407, 416 (1963); *State v. Askerooth*, 681 N.W.2d 353, 370 (Minn. 2004). A warrantless seizure that was "initiated at the threshold of a suspect's residence" is not prohibited "if the suspect voluntarily opens the door." *State v. Howard*, 373 N.W.2d 596, 598 (Minn. 1985). But an encounter is not voluntary if police command a suspect to talk with them in such a way that a reasonable person would feel that the command cannot be refused. *State v. Dezso*, 512 N.W.2d 877, 880 (Minn. 1994) (citing *Florida v. Bostick*, 501 U.S. 429, 435-36, 111 S. Ct. 2382, 2387 (1991)).

"The test [for voluntary consent] is the totality of the circumstances." *Id.* "[W]e will defer to the findings of the district court on the voluntariness of the consent, unless those findings are clearly erroneous." *State v. Diede*, 795 N.W.2d 836, 853 (Minn. 2011). "The district court's findings are clearly erroneous only if, after reviewing the evidence, we are left with the definite and firm conviction that a mistake occurred." *Id.* at 853-54. Although the officer phrased it as an imperative, the district court found that the officer did not issue a command under color of authority. We agree. While

5

investigating a DWI report, it is expected that officers would approach people who are near the location where a reported car is found. In this instance, the officers did not approach with emergency lights on. Nor did they rouse the residents from sleep, given that the officers could hear yelling before they knocked. Rather, after briefly knocking on the door and responding to the occupants' questions about their intentions, the officer requested to speak with the people inside the apartment. Nothing in the record indicates that the request to open the door was made in a manner other than a calm tone or that it was louder than necessary to be heard through the apartment door.

Throughout the encounter, Gorgol's tone and demeanor were not that of a person acquiescing to authority. First, Gorgol waited until his questions about the officer's intentions were answered before opening the door, demonstrating that he did not feel an immediate need to comply with the officer's request. Second, he refused the officer's requests to come inside or to have him step outside, showing that he understood his right to refuse cooperation and intended to set limits on the encounter. Finally, his responses to questions and general demeanor did not support a finding of a willingness to submit to police authority.

The dissent states that circumstances after Gorgol opened the door "are not relevant to a determination of whether his initial consent was freely and voluntarily given." We disagree because Gorgol demonstrated no compulsion to comply with the officers' requests. The officers acted to arrest Gorgol only after they identified Gorgol as the driver of the vehicle observed at the toll booth and noticed indicia of intoxication. It

is only at that point that the officers acted under the color of authority. These additional factors are what justified Gorgol's arrest after he opened the door.

Given the totality of the circumstances, the district court did not clearly err, and we defer to its finding of consent. Because we affirm the district court's finding of consent, we do not reach the issue of whether exigent circumstances existed that would have justified a warrantless seizure.

## II.

Gorgol next argues that the district court erred by admitting the full implied-consent-advisory recording, including statements made during the breath test. Gorgol contends that the officers interrogated him at various points during the recording, arguing that the officers should have known that their questions and remarks would elicit an incriminating response.

Because defense counsel did not object to admission of the recording, we review only for plain error. *See* Minn. R. Crim. P. 31.02; *State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998). To grant relief under plain-error review, "there must be (1) error, (2) that is plain, and (3) affects substantial rights." *State v. Ramey*, 721 N.W.2d 294, 302 (Minn. 2006). An error is plain "when it contravenes a rule, case law, or a standard of conduct, or when it disregards well-established and longstanding legal principles." *State v. Brown*, 792 N.W.2d 815, 823 (Minn. 2011). An error affects substantial rights if "there is a reasonable likelihood that the error substantially affected the verdict." *Id.* at 824 (quotation omitted).

A suspect in custody must be informed of his rights to remain silent and to consult an attorney before being interrogated. *Miranda v. Arizona*, 384 U.S. 436, 478-79, 86 S. Ct. 1602, 1630 (1966). Any evidence procured in violation of *Miranda* cannot be admitted at trial. *Id.* The state concedes that Gorgol was in custody and had not received a *Miranda* warning.

Interrogation includes "'any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *State v. Ingold*, 450 N.W.2d 344, 346 (Minn. App. 1990) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 1689 (1980)), *review denied* (Minn. Mar. 8, 1990). A district court should examine a defendant's statements in light of the suspect's viewpoint, not the police officer's subjective intent. *Id.* Providing information about the implied-consent law and asking questions to confirm that the information was understood does not constitute interrogation. *Pennsylvania v. Muniz*, 496 U.S. 582, 603, 110 S. Ct. 2638, 2651 (1990). Based on *Muniz*, Gorgol concedes that some of the recording was admissible, but challenges two specific portions.

Gorgol's first challenge is to a recitation of the evidence against him. Initially, in the recording, Gorgol asked why he was arrested, and the officer replied, "I already told you, for driving while intoxicated." Gorgol retorted that he was not driving at the time of his arrest. The officer then explained that he was arrested because the toll-booth operator reported seeing him driving earlier that night. Gorgol then gave alternative explanations of what the toll-booth operator saw, while ignoring the officer's attempt to draw his attention back to the implied-consent advisory. This exchange, which was initiated by

8

Gorgol, was not interrogation. Moreover, describing the evidence and charges against a suspect is not interrogatory. *United States v. Wipf*, 397 F.3d 677, 685 (8th Cir. 2005) (citing other circuits with similar holdings).

Gorgol highlights the officer's question, "That was tonight?," as an example of interrogation. However, Gorgol had already said that he talked to the toll-booth operator "two, ten hours ago." So, the question could only have elicited a response from Gorgol that was either exculpatory, by denying that he talked to the toll-booth operator that night, or duplicative of his earlier, admissible statement that he had in fact talked to the toll-booth operator.

Gorgol's second challenge is to the admission of his description of the evening's events given after the officer administering the breath test said, "[T]ell me what happened." Asking a suspect what happened is not innocuous small talk under these circumstances. The inquiry was likely to elicit the suspect's version of events, which could be incriminating or contradict earlier statements; therefore, the inquiry was interrogatory. Because the recording contained evidence that was obtained in violation of *Miranda*, the admission of the full recording was plain error.[1]

But the error here did not affect Gorgol's substantial rights because there was overwhelming evidence supporting the conviction. The only incriminating remarks made to the officer during the breath test were that Gorgol had been drinking earlier in the day and had access to the car because his girlfriend owned it.

---

[1] We are empathetic to the heavy burden placed on the district court to identify a possible error in the final minutes of a lengthy recording played in full when defense counsel has not raised the issue in advance or otherwise objected.

9

In order to convict Gorgol of DWI, the jury must have found that he was driving a motor vehicle, he was under the influence of alcohol at the time, and that the act happened on August 24, 2013, in Clay County. *See* Minn. Stat. § 169A.20, subd. 1(1) (2014). The toll-booth operator testified that she saw Gorgol driving a white car, that he nearly fell out of his car during his second attempt to pay the toll, that his speech was slurred, and that he was swerving and almost hit a portable toilet as he left. She also testified that she called police and gave them the car's license plate and a description of Gorgol. Next, an officer testified that he went to the address at which the car was registered, found a car matching the toll-booth operator's description, and identified Gorgol, who matched the description given and appeared "very intoxicated." Both witnesses testified that these events occurred on August 24, 2013, in Clay County. Even without Gorgol's admissions, there was ample evidence to support conviction.

In order to convict Gorgol of DWI with an alcohol concentration of .08 or greater, the jury must have found that he was driving a motor vehicle, that his alcohol concentration was .08 or more within two hours of driving, and that the act happened on August 24, 2013, in Clay County. *See* Minn. Stat. § 169A.20, subd. 1(5). Regarding the alcohol-concentration element, the toll-booth operator testified that she saw Gorgol driving shortly before midnight, and the breath-test results indicated that Gorgol's alcohol concentration was .19 at 1:20 a.m. Again, without considering the portions of the recording admitted in error, there was ample evidence to support conviction. Because there was overwhelming evidence supporting conviction, the error did not affect Gorgol's substantial rights.

10

## III.

Finally, Gorgol argues that he did not receive effective assistance of counsel because his defense counsel did not object to the admission of the full recording of the implied-consent advisory and the breath test.

"Claims of ineffective assistance of counsel are reviewed de novo because they involve mixed questions of fact and law." *State v. Hokanson*, 821 N.W.2d 340, 357 (Minn. 2012). In order to succeed, "appellant must show that his trial counsel's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* (quotation omitted). "[T]here is a strong presumption that counsel's performance was reasonable . . . ." *Id.* at 358.

Gorgol fails to demonstrate that the outcome of his trial would have been different if his attorney had objected to the recording. Here, the statements contained in the objectionable part of the recording were not necessary to a conviction. Rather, there was overwhelming evidence to support conviction in the form of eyewitness testimony, Gorgol's admissible statements, and the results of his breath test; therefore, Gorgol's ineffective-assistance-of-counsel argument fails because there was no reasonable probability that the result would have been different had his counsel objected.

**Affirmed.**

11

**HUDSON**, Judge (concurring in part and dissenting in part)

# I

I respectfully dissent from the majority's conclusion that appellant Charles Edward Gorgol voluntarily consented to the seizure by opening his door and speaking to police officers. Because the totality of the circumstances establishes that Gorgol simply acquiesced to a show of authority by law enforcement, I would reverse the district court's order denying Gorgol's motion to suppress and dismiss the case against him.

A seizure occurs when law enforcement, by means of physical force or some other show of authority, restrains the liberty of a person. *In re Welfare of E.D.J.*, 502 N.W.2d 779, 781 (Minn. 1993). Warrantless seizures inside a person's home are presumptively unreasonable unless an exception to the warrant requirement applies. *Payton v. New York*, 445 U.S. 573, 586, 589–90, 100 S. Ct. 1371, 1380, 1381–82 (1980). Freedom from intrusion into the home "is the archetype of the privacy protection secured by the Fourth Amendment" and Minnesota "has long adhered to the common law recognition of the home's importance." *Id*. at 596–97, 100 S. Ct. at 1385; *State v. Carothers*, 594 N.W.2d 897, 900 (Minn. 1999).

Consent is a valid exception to the warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2043 (1973). A warrantless seizure that occurs at the threshold of a person's home is constitutionally valid if that person consents to opening his door in response to police knocking. *State v. Howard*, 373 N.W.2d 596, 598 (Minn. 1985). But the consent exception applies only when the state proves by a preponderance of the evidence that the defendant's consent was given freely and

voluntarily. *Schneckloth*, 412 U.S. at 222, 93 S. Ct. at 2043. "Mere acquiescence on a claim of police authority" is insufficient to establish voluntary consent. *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968); State *v. Howard*, 373 N.W.2d 596, 599 (Minn. 1985). A defendant's consent is voluntary only when the totality of the circumstances establishes that a reasonable person would have felt free to decline law enforcement's requests or to terminate the encounter. *State v. Dezso*, 512 N.W.2d 877, 880 (Minn. 1994).

The majority concludes that Gorgol voluntarily consented to opening his door because he did so in response to law enforcement's "request" to speak with him and because his tone and demeanor "were not that of a person acquiescing to authority." I respectfully disagree. Multiple officers arrived at Gorgol's home late at night, knocked repeatedly and loudly on his door, and twice ordered him to "open the door so we can talk to you."[1] *Cf. State v. George*, 557 N.W.2d 575, 581 (Minn. 1997) (concluding consent was involuntary because the two troopers created "intimidating circumstances" that led the defendant to acquiesce to police authority); *United States v. Flowers*, 336 F.3d 1222, 1226 n.2 (10th Cir. 2003) (concluding that "a reasonable person confronted by police officers outside his door at night and a command by one of the officers to allow them to enter, would have believed that he had to open the door of his home and submit to the show of authority"). The officers were persistent; they used authoritative language throughout the encounter and their tone and demeanor clearly established that they were

---

[1] Contrary to the majority's characterization that law enforcement "requested" that Gorgol open the door, one of the responding police officers agreed at the omnibus hearing that he "demanded" that Gorgol open the door so he could talk to him.

asserting a claim of police authority. *Cf. Dezso*, 512 N.W.2d at 881 (finding consent involuntary because it was given in response to officer's "official and persistent" questioning); *State v. Diede*, 795 N.W.2d 836, 847–48 (Minn. 2011) (concluding that defendant did not voluntarily consent to search when she initially refused to consent but acquiesced to search after multiple, persistent requests from officers). A reasonable person would conclude, under the totality of those circumstances, that he had no choice but to adhere to the officers' commands and open the door to his residence.

In addition, the majority's conclusion that Gorgol voluntarily opened his door is based in part on his conduct after he opened the door and began to speak with law enforcement. Because those circumstances occurred after Gorgol opened the door, they are not relevant to a determination of whether his initial consent was freely and voluntarily given. If those circumstances are deemed relevant, the totality of the circumstances would also include the officers' conduct after Gorgol opened the door; their conduct further establishes that they were acting under "the color o[f] police authority." *State v. Armstrong*, 292 Minn. 471, 473, 194 N.W.2d 293, 294 (1972). When Gorgol opened his door, he was instructed to exit his home and speak with the officers; when he refused, they immediately informed him that he had the option to "step out of the apartment and continue to speak with [them]" or that they would "just arrest [him]." After Gorgol again "refused to [talk with the officers]," they directed him to exit his home and placed him under arrest.

The officers' conduct demonstrates that Gorgol was required to cooperate with their commands, that he had no right to limit the scope of the police encounter, and that

C/D-3

he did not have the option to terminate the encounter and return to his home. Based on the circumstances of that encounter, Gorgol merely acted in acquiescence to law enforcement's display of authority. Accordingly, I would conclude that the state did not sustain its burden to prove that Gorgol voluntarily consented to the seizure, that he was unlawfully seized by law enforcement and that the district court should have suppressed all evidence that resulted from that seizure.[2]

_____

Judge Natalie E. Hudson

---

[2] Because the state does not argue that the exigency exception to the warrant requirement applies here, I do not consider whether that exception would justify appellant's seizure. *State v. Butcher,* 563 N.W.2d 776, 780 (Minn. App. 1997), *review denied* (Minn. Aug. 5, 1997).